**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOYCE McACHREN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|        v. | )     **Civil No. 02-285 Erie** |
| | ) |
| SAINT VINCENT HEALTH CENTER, | ) |
| | ) |
|     Defendant. | ) |

<u>**Opinion**</u>

Plaintiff Joyce McAchren brings this civil rights employment discrimination action asserting that she was wrongfully terminated from her job with Defendant Saint Vincent Health Center based on her age in violation the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621 *et seq*.) (Count I) and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. 951, et seq. (Count II). Ms. McAchren also asserts a claim of wrongful discharge alleging that in violation of Pennsylvania public policy Defendant terminated her in retaliation for filing a workers' compensation claim in violation of Pennsylvania public policy (Count III).

Presently before the Court is Defendant's motion for summary judgment (Doc. 17), to which Plaintiff has responded. For the reasons stated below, we will grant Defendant's motion and dismiss this action.

**I.     GENERAL BACKGROUND**

Joyce McAchren was hired by Saint Vincent Health Center as a Registration/Discharge Clerk on August 8, 1994, working at Defendant's Lawrence Park Family Practice. Ms. McAchren

was born on March 31, 1947, making her 47 years old at the time of her hire.  In 1998, the Lawrence

Park Family Practice merged with Defendant's Harbor Creek Medical Practice, with the new name

of East Harbor Primary Care.  As a Registration/Discharge Clerk, Ms. McAchren's responsibilities

included answering telephones, scheduling patients for office visits, checking patients in, taking

information from patients for prescription refills, and discharging patients.

During her time with Defendant, Ms. McAchren received evaluations in each year from

1996 through 1999.  While she was with the Lawrence Park Family Practice her 1996 evaluation

was completed by Kristin Lazzara, and her 1997 evaluation was completed by the Office Manager

of the Practice, Jan Tassario.  These two evaluations included detailed comments and were critical

of Ms. McAchren's job performance.  At the East Harbor Medical Practice, her 1998 evaluation was

completed by Denise Liberatore, and her 1999 evaluation was completed by Lynn Schnars.  These

two evaluations contained minimal comments but did find Ms. McAChren to be competent in her

job performance.

During the relevant time period Nancy Potter was the Practice Manager responsible for East

Harbor, and beginning in April 2000, Katrine Danowski was the Clinical Coordinator.  James W.

Lane, M.D. and Carl Eby, M.D. were physicians who worked at both the Lawrence Park Family

Practice and the East Harbor Medical Practice throughout Ms. McAchren's employment.  Michael

Madden, M.D. was the Medical Director for Saint Vincent Medical Group responsible for the

medical providers at the practice and the quality of the clinical services.  Finally, throughout the

relevant time period the Director of Associate Relations for all of Saint Vincent Health Center was

Johnie Atkinson.

During her time at East Harbor, Ms. McAchren's responsibilities were changed from time to

2

time.  At one point, the duties of answering telephones and making patient appointments were split into a phone operator position and a registration position, with Ms. McAchren assuming the phone operator position.  On May 22, 2000, Ms. McAchren was moved to the medical records department and was responsible for filing and retrieving patient charts and records.  On her first day in the medical records department Ms. McAchren began wearing a back brace.  She eventually mentioned her back pain to Ms. Danowski who suggested that Ms. McAchren contact the Employee Health Services.

On June 29, 2000, Ms. McAchren filed a Confidential Associate Injury Report with the Employee Health Service, alleging work-related back and knee injuries first occurring in June, 1998.  On June 30, 2000, Ms. McAchren presented a doctor's note to Ms. Potter and Ms. Danowski stating that she should not continue to work in medical records due to her 1998 back injury.  Ms. McAchren never filed a workers' compensation claim, however, based on the report of the injury to Employee Health, Defendant's employee in charge of worker's compensation issues reported Ms. McAchren's injury information to Defendant's workers' compensation carrier.

Ms. McAchren began an approved medical leave for surgery unrelated to her back injury on July 1, 2000, returning to work on August 21, 2000.  When she returned from her medical leave, Ms. McAchren was assigned to work at the registration desk because she could not work in medical records due to her back injury.

While Ms. McAchren was on leave, Defendant learned from the Highmark insurance company that two of its customers had complained specifically about Ms. McAchren's rude behavior on the telephone.  As a result, Ms. Potter and Ms. Danowski created and implemented a work improvement plan for Ms. McAchren aimed at improving her performance.  Ms. Potter and

Ms. Danowski presented and discussed the action plan with Ms. McAchren on August 25, 2000. As part of the Plan, Ms. McAchren was scheduled for additional service excellence education; her duties were to be monitored daily by Ms. Danowski; and she was to attend weekly meetings with Ms. Potter to discuss her performance, customer concerns, and general concerns.

While on the action plan, Defendant received three more patient complaints about Ms. McAchren's rude and unprofessional behavior. Because of the recent complaints and Ms. McAchren's seeming failure to acknowledge a problem Ms. Potter and Ms. Atkinson met with Ms. McAchren on September 15, 2000, and suspended her with a recommendation of termination pending an investigation. On September 21, 2000, Ms. Atkinson informed Ms. McAchren that an investigation had been completed and that St. Vincent Health Center was upholding the recommendation for termination, thus her employment was terminated as of September 15, 2000.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment may be granted only if the moving party establishes that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. Summary judgment is appropriate only when the record evidence could not lead a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-49 (1986). In evaluating a motion for summary judgment the court does not weigh the evidence or make credibility determinations. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000). Rather

4

than evaluating the evidence and determining the truth of the matter, the court determines whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. <u>Reeves</u>, 120 S.Ct. at 1210; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

Once the party moving for summary judgment has satisfied its initial burden of production on the motion, then the burden shifts to the party opposing the motion. The party must set forth specific facts to show that there is a genuine issue for trial. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and has an affirmative duty to produce evidence demonstrating the existence of a factual dispute. <u>Matsushita</u>, 475 U.S. at 586. The court must evaluate the entire setting of the case, including the record and all materials submitted in accordance with the motion for summary judgment; whether it is clear that a trial is unnecessary; and whether there is any doubt as to the existence of a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324-25.

## III.   <u>DISCUSSION</u>

Defendant argues that Ms. McAchren cannot establish a prima facie case for either her age discrimination claim or her retaliation claim. In addition, even if she could establish a prima facie case Defendant argues that she cannot rebut Defendant's legitimate non-discriminatory or non-retaliatory reasons for terminating her. Generally, Defendant claims that Ms. McAchren is not qualified for her position based on a lengthy history of poor performance, rude and unprofessional conduct towards patients, and her failure to acknowledge or address these deficiencies despite Defendant's attempts to help her. Ms. McAchren claims that she performed competently throughout her employment and challenges Defendant's evidence in support of its claim that Ms. McAchren

was fired because of her poor work performance. She thus argues that genuine issues of material fact exist precluding the entry of summary judgment

With regard to the retaliation claim, Defendant argues that Ms. McAchren admitted that she had never filed a workers' compensation claim thereby making it impossible for her to establish that she was fired when she had only engaged in protected activity. Ms. McAchren claims that once she filed an internal injury report with Defendant's Employee Health Service a workers' compensation claim was automatically filed by Defendant, and therefore it is reasonable to "surmise that Plaintiff's Supervisor" was aware of the claim.

## A. Age Discrimination

The same analysis is used for both Plaintiff's ADEA claim and her PHRA claim. See O'Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998). Under the ADEA, "[i]t shall be unlawful for an employer (1) . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

The familiar McDonnell Douglas analysis requires: "first, that the plaintiff establish a prima facie case of employment discrimination; second, that the employer proffer a nondiscriminatory reason for its adverse employment action; and third, that the plaintiff must then show that the employer's proffered explanations were pretextual." Williams v. Shenango, Inc., 986. F. Supp. 309, 318 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); see also Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313 (3d Cir. 2000).

To establish a prima facie case of age discrimination, a plaintiff must show that he or she:

(1) was a member of the protected class, i.e., was over 40, (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person

sufficiently younger to permit an inference of age discrimination. Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).

Monaco v. American General Assurance Company, 359 F.3d 296, 300-301 (3d Cir. 2004), cert. den'd, 125 S.Ct. 62 (2004).

Once a plaintiff sets forth a prima facie case, the defendant has the relatively light burden of coming forward with a legitimate, non-discriminatory reason for the adverse employment decision. Goosby, 228 F.3d at 319. "If the employer is able to proffer a legitimate non-discriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful discrimination." Id.

### 1. Prima Facie Case of Age Discrimination

Defendant argues that Plaintiff's age discrimination claim fails because Ms. McAchren cannot establish a prima facie case, *i.e.*, she cannot show that she was qualified for the position of Registration/Discharge Clerk. The duties of the Clerk include, inter alia, answering telephones, scheduling patient office visits, checking patents in and out, and taking information from patients for prescription refills. Of primary concern for the Defendant is that the position requires excellent customer service skills given that the first person a patient encounters either on the telephone or in person is the Registration/Discharge Clerk. Defendant claims that throughout Ms. McAchren's employment there were numerous complaints from the practice's doctors, patients, and co-workers about her poor job performance, in particular her rudeness and impropriety towards patients. Defendant asserts that despite its efforts to counsel and train Ms. McAchren to be able to perform her job in the area of customer service it eventually became apparent that she did not possess the requisite skills to successfully perform her position. Defendant argues that Ms. McAchren's overall employment history shows that she was not qualified for her position.

### a. Ms. McAchren's Evaluations

As noted, Ms. McAchren received four evaluations during her tenure with Defendant.

### *i. 1996 Evaluation*

Plaintiff's 1996 Competency Assessment identifies four of nine areas of "Responsibilities/Competencies/Expectations" where Ms. McAchren was designated as not competent.  (1996 Competency Assessment, attached as Ex 1. to Def. Ex. A (McAchren Dep.).) According to the Assessment Ms. McAchren was not competent in performing the patient registration process; handling incoming telephone calls; performing the patient discharge duties; and maintaining daily office cash flow.  (Id.)   The Assessment form was completed by Kristin Lazzara, who handwrote the following relevant comments in an adjoining column entitled "Comments/Strategies/Improvements/Outcomes":

> Joyce performed the registration function daily until the patient complaints became overwhelming.  She was told not to answer phones and her jobs + tasks in the office decreased significantly.

> Joyce was told specifically about her phone etiquette and taken off the phones.  Because of the volume of phone calls, Joyce is needed.  Her performance will be monitored.

> At one time Joyce performed the discharge function, but no longer feels comfortable with this task.  Rarely does Joyce schedule or discharge patients.  She will perform this function during evening hours and also when the others are absent.

> Joyce works hard and is not a malicious [person], but is not carrying her weight in the front office.  We have discussed this several times and she has also met with the physicians. Joyce cannot seem to understand these accusations. . . .

A specific four-page Competency Tool for the Registration/Discharge Clerk position is attached to the 1996 Competency Assessment.  This form sets forth more specific areas of evaluation for the position.  Ms. Lazzara also handwrote comments with regard to some of these areas as follows:

**2.2    Welcomes each patient upon arrival.**

Joyce does not welcome patients from her position in [the] front office.

**3.1 Promptly answers telephone and triages telephone calls as needed.**

Joyce does not answer phone calls due to her demeanor on the phone.  She has been asked to stay off the phone because of her manners and rudeness to patients.  Joyce can in no way understand what the problems are or the fact that patients complain [.]

**3.3    Responds to telephone inquiries in a professional manner.**

Joyce has been asked by Dr. Lane or Eby not to answer phone calls because of her lack of professionalism.

At the bottom of the page, underneath the general evaluation area "3. HANDLES INCOMING

TELEPHONE CALLS" is listed the following comment:

Since the volume has increased, Joyce has been asked to help out [rest of sentence is cut off.]

On the last page of the Competency Tool, Ms. Lazzara wrote the following comments:

. . .  We need to have Joyce perform more of the front office tasks in order to have the work evenly distributed . . .

Joyce does not agree[] that she is not carrying her load.  She has worked in healthcare 12 years and feels she has done a fine job.

### ii.  1997 Evaluation

An Associate Communication Form addressed to Ms. McAchren and another employee

named Ann was prepared by the Office Manager Jan Tassario on December 30, 1997.  This Form

stated that Joyce and Ann had "made no significant progress with registration and charge entry

despite the additional resources and meetings that have been held with you both."   (December 30,

1997 Associate Communication Form, attached as Ex 2. to Def. Ex. A (McAchren Dep.).)  This

memo recounts the history of recent meetings addressing the two employees' failure to fulfill the

expectations of their job duties with respect to "charges, hospital billing and registrations."  (Id.)

9

On December 1, 1997, Ms. Tassario and Laurie Dart met with the employees to discuss their "expectations and actions that must be taken to ensure that charges were addressed." (Id.)   This meeting was necessary because the office was falling behind in these tasks because it was short-staffed until an open full time clerical position was filled.   (Id., Memorandum from Laurie Dart to Patty Ballman, Dr. Trotta, Dr. Lane and Dr. Eby, dated December 9, 1997, and attached "Event Report," ("Explained that until we hire Michelle's replacement the work flow must continue").)

On December 18, 1997, Ms. Tassario again met with the employees, this time with Patty Ballman, in order to discuss "the seriousness of the situation and lack of progress." (Id.)  Ms. Tassario again met with the employees on December 23, 1997 "to address your lack of response to fulfilling the expectations of your job duties . . . ."   (Id.)  Ms. Tassario recounted that at the December 23rd  meeting the employees "were informed that you must keep all registrations updated daily and that at least 40 charges a day must be entered." (Id.)  Ms. Tassario also explained that with regard to registrations and charges Joyce and Ann

> are both equally responsible to ensure that those two directives will be met.  It is imperative to the practice that those two directives are carried out.   Failure to do so will result in the appropriate disciplinary action being taken.

(Id.)

The purpose of the December 30, 1997 Associate Communication Form was to set forth an action plan with regard to the deficient performance.   Attached to the Form was a December 30, 1997 memo from Laurie Dart to Joyce and Ann with an "Event Report" regarding some of the events that occurred in December 1997 concerning the task of registrations and charges.  On December 3, 1997, Ms. Dart noted that as of December 19, only $4,000 in charges had been keyed in, which amounts to "barely one fee slip per Ann and Joyce per day."   In addition, she noted that

the registrations were not current and "the schedule had not been touched"  until another employee

was brought in.  Ms. Dart concluded the Event Report as follows:

> Despite the resources of Suzanne Boyer, Deb Strike, Heather Mozfdy and PSS no real
> progress has been made.  Ann and Joyce continue to complain to the doctors.  Patty, Myself
> and Jan have made great efforts to offer resources and implement change.  I think effective
> immediately, Ann and Joyce should come up with a work plan that they are 100% accountable for and presents

(Id.)

### iii.  1998 Evaluation

Plaintiff's 1998 Competency Assessment was prepared by Denise Liberatore and completed

on April 23, 1998.  (1998 Competency Assessment, attached as Ex 2. to Pl. Ex. L.)  Ms. McAchren

was rated as meeting competency in all nine of the listed Competency areas.  The following

comments were handwritten in the adjoining "Comments/Strategies/Improvements

/Outcomes"column:

> Greet Pt's at window - ask ques[tion] about up-dated info. - when able reg[ister] pt in IDX
> sys[tem]

> Cover discharge windows when needed - make f[ollow] u[p] if necessary - receive
> [illegible] if necessary

> Would like to increase education skills by attending seminars when available

(Id.)  The remaining four pages of this form are not completed.  (Id.)

### iv.  1999 Evaluation

Plaintiff's 1999 Competency Assessment was prepared by Lynn Schnars and completed on

October 5, 1999.  (1999 Competency Assessment, attached as Ex 3. to Pl. Ex. L.)  On the 1998 and

1996 forms there are nine listed Competency areas on the first page.  On the 1999 form, this list has

been reduced to four areas.  Ms. McAchren was rated as meeting competency in all four of the listed

Competency areas.  The following comment was handwritten in the  adjoining column:

> Joyce effectively communicates with patients + staff in a sometimes difficult position as being on the "front line" representation for the practice.  At times she would do better with more outlined plans to use for certain situations and we are working on that.

(Id.)  The remaining four pages of this form are also not completed.  (Id.)

### b. Complaints from Doctors Lane and Eby

James W. Lane, M.D. and Carl Eby, M.D. were physicians at the Lawrence Park Practice and the East Harbor Practice the entire time that Ms. McAchren worked at these practices. (Affidavit of James W. Lane, M.D., Def. Ex. 2; Affidavit of Carl Eby, M.D., Def. Ex. 3.)  The affidavits reflect the following:

> • Both doctors had substantial interaction with Joyce McAchren,  had the opportunity to observe her job performance, and opined that her job performance during her employment at Lawrence Park/East Harbor was poor (Lane Affidavit, at ¶¶ 4-5  ;Eby Affidavit at ¶ 4.)

> • Both doctors stated that they received many complaints from patients concerning Ms. McAchren's demeanor, including patient complaints that she was rude, unprofessional and unhelpful in person and on the phone; both also report that some of their patients left the practice in part due to their negative experiences with Ms. McAchren's.  (Lane Affidavit, at ¶¶ 6-7; Eby Affidavit at ¶¶ 5-6.)

> • Both doctors stated that they discussed Ms. McAchren's deficiencies with management and with the Medical Director, Dr. Michael Madden, numerous times from 1996 through her termination.  (Lane Affidavit, at ¶ 8; Eby Affidavit at ¶ 7.)

> • Both Doctors also reported that it was clear that Ms. McAchren "did not recognize or acknowledge that there was a problem with her performance or with her interaction with patients."  (Lane Affidavit, at ¶ 8; Eby Affidavit at ¶ 7.)

> • Both doctors stated that they eventually left the practice in part because of their "frustration with what [they] perceived to be management's lack of progress in addressing employee performance issues at East Harbor, including those involving Joyce McAchren," and that each doctor had advised the management of the practice and Dr. Madden of the reasons why they left the practice.  (Lane Affidavit, at ¶ 8; Eby Affidavit at ¶ 7.)

> • Both doctors left the practice after Ms. McAchren was terminated.  Dr. Lane left the practice in January 2001, and Dr. Eby in December 2000 (Lane Affidavit, at ¶ 8; Eby Affidavit at ¶ 7.)

Dr. Madden testified that Doctors Lane and Eby told him that Ms. McAchren's "interactions with patients were rude, and they had gotten a number of complaints from patients about that. And that there were other job duties, that I don't recall the details of those, that she was not performing well." (Madden Dep., at 8, Def. Ex. G.) He also testified that the two doctors told him that part of the reason they left was due to Ms. McAchren's poor performance and the practice's inability to aggressively deal with her performance problems. (Madden Dep., at 10.) Dr. Madden memorialized this information in a memo to Johnie Atkinson dated August 16, 2001. (Ex. 1 to Madden Dep.) In addition, Ms. Atkinson testified that she was aware that doctors Lane and Eby had complained about Ms. McAchren's performance. (Atkinson Aff., at 20- 21; 30, Def. Ex. D.)

### c.  Patient Complaints

In addition to Drs. Lane and Eby's general statements that many patients complained about Ms. McAchren, Defendant also cites to several specific patient complaints about Ms. McAchren in support of its argument. (Potter Dep., at 10-12; Danowski Dep., at 17, 30-33; 34-36; 39-41; Highmark Documents attached as Ex. 2 to Def. Ex. I.)

### i.  Complaints from Highmark Customers

Defendant claims that two Highmark customers that were patients of the East Harbor Practice complained to Highmark about Ms. McAchren's inappropriate behavior towards them. (Highmark documents of inquiries to the member service department that refers to a Joyce from East Harbor Primary Care, attached as Ex. 2 to Def. Ex. I; Potter Dep., at 19, 75; Atkinson Dep., at 36.)

Highmark documents show that on April 6, 1999 one of its customers called to complain about her treatment at the East Harbor practice. (Ex. 2 to Def. Ex. I., at 2.) The patient stated that

13

she called the East Harbor Practice to make an appointment and "Spoke to Joyce" who was very

rude to her, and told the patient that she was not on the roster and that an appointment would not be

made until she was on the roster.  (Ex. 2 to Def. Ex. I., at 2.)  The patient asked Joyce to call the

insurance company to verify her enrollment, and Joyce told the patient it was not her responsibility

and that the insurance company must call her.  (Id.)   Highmark documents that in May, 2000,

another of its customers who had spoken with Joyce had a hard time getting a referral in an

emergency situation, and the case was being investigated by Highmark.  (Ex. 2 to Def. Ex. I., at 5-

8.)  Handwritten on one of the Highmark pages is a note dated 5/10/00 noting that the case was

discussed with Nancy Potter.  (Id.)

Ms. Atkinson testified that it was not common for Highmark to report that one of its

customers had identified a specific employee by name as being the source of unsatisfactory service.

(Atkinson Dep., at 36.)  Ms. Potter learned of the two complaints about Joyce when she had her

quarterly review with Highmark.  (Potter Dep., at 19.)

### ii.  Complaints from Three Other Patients

Defendant also claims that three patients directly complained about Ms. McAchren behavior

towards them after Ms. McAchren was put on an action plan.

### *(a)*

On August 25, 2000, a patient arrived to obtain a referral to have her cast replaced, or to

have it replaced in the office.  (August 28, 2000 Associate Communication Form, McAchren Dep.

Ex. 12, attached to Def. Ex. A; Affidavit of Lisa Gorka, January 14, 2005, attached as Def. Ex. A to

Defendant's Reply Brief.)  The patient, Lisa Gorka, complained that "Joyce was very nasty and

short with her at the window."  (Id.)  Ms. Gorka eventually spoke with a supervisor, Katrine

14

Danowski, and identified Ms. McAchren by name and by pointing to her.  (Danowski Dep., at 30, 32-33.)  Two other East Harbor employees confirmed Ms. Gorka's complaint that Ms. McAchren had been rude to her.  (Danowski Dep., at 31-32, 34.)

Ms. McAchren was counseled by Ms. Danowski and Ms. Potter, and she was given a written warning.  (August 28, 2000 Associate Communication Form, McAchren Dep. Ex. 12, attached to Def. Ex. A.)   Ms. McAchren signed the written warning on the space designated "I disagree with this statement."  (Id.)  Ms. McAchren claims that she was not the person Ms. Gorka talked to on August 25, 2000.  (McAchren Dep., at 54.)

*(b)*

On September 6, 2000, Sharon Markle telephoned Ms. Danowski to complain about her experience telephoning the office the previous day.  (September 6, 2000 Associate Communication Form, McAchren Dep. Ex. 13, attached to Def. Ex. A; Danowski Dep., at 23, 40.)   Ms. Markle said that she called in the morning on September 5, 2005, and was put on hold by Joyce without being asked why she had called.  (Id.) She hung up after waiting ten minutes and called back at 4:36 p.m. the same day.  (Id.)  The same Clerk answered the phone on the afternoon call and again put Ms. Markle on hold without asking why she had called.  (Id.) Ms. Markle stayed on the line until she was disconnected shortly after 5:00 p.m. when the phones were switched to the answering service. (Id.)

Ms. Danowski testified that Ms. Markle identified the clerk who took her calls as Ms. McAchren.  (Danowski Dep., at 23, 41.)  Ms. Danowski prepared an Associate Communication Form detailing the information taken from Ms. Markle's telephone call and noted that Ms. Markle stated that she was put on hold by "Joyce."  (September 6, 2000 Associate Communication Form,

McAchren Dep. Ex. 13, attached to Def. Ex. A.)  Ms. McAchren was again counseled by Ms.

Danowski and Ms. Potter, and given a written warning.  (Id.)  Ms. McAchren signed the written

warning on the space designated "I disagree with this statement."  (Id.)

Ms. McAchren claims that she was misidentified as the clerk who spoke with Ms. Markle.

On December 4, 2001, Ms. Markle testified at Ms. McAchren's workers' compensation hearing that

when she did not tell Ms. Danowski who the Clerk was who answered her call because she did not

know who it was.  (Markle testimony, at 41, Pl. Ex. M.)   Ms. Markle also testified that Ms.

Danowski asked her if the person who answered her call was Joyce.  (Id.)  Ms. Markle replied that

the person was not Joyce.  (Id.)

### (c)

On September 11, 2000, James Hughes complained that Ms. McAchren "did not make any

effort to assist" him when he came to the office to pick up his wife's X-rays.  (September 12, 2000

Associate Communication Form, McAchren Dep. Ex. 14, attached to Def. Ex. A.)  In fact, he had to

make two trips to the office based on Ms. McAchren's initial wrong information and had to lose

work time.  (Id.)  Ms. McAchren was counseled by Ms. Danowski, and given a written warning.

(Id.)  Ms. McAchren did not sign the written warning, and claims it was never presented to her.  (Id.;

McAchren Dep., at 55.)

### d.  St. Vincent's Efforts to Assist Ms. McAchren

Defendant asserts that in response to Ms. McAchren's poor job performance, management

tried to help her succeed in several ways.  First, the Registration/Discharge Clerk position was split

into two positions.  Because of her poor performance Ms. McAchren was assigned the duty of

answering telephones, and she no longer had the responsibility of making appointments.  (Potter

16

Dep., at 8.)  Next, while remaining as a telephone operator, her chair and desk were moved to a

quieter area so "it would be easier for her to concentrate on what she was doing in answering the

phones rather than the distraction of people coming to the window and coming to the desk."  (Id., at

9.)  Next, after the telephone complaints continued, management moved Ms. McAchren to a

position in the medical file room.  (Id.)

While Ms. McAchren was on an approved medical leave, Ms. Potter attended a regularly

scheduled meeting with representatives from Highmark at which Ms. Potter learned of the two

customer complaints that named Ms. McAchren.  (Potter Dep., at 19, 75.)  Because of these two

complaints and in light of staff and physician comments concerning her poor performance, Ms.

Danowski's own observations of Ms. McAchren's frustration at the registration window, and a

backlog of information that Ms. McAchren had not yet entered, Ms. Potter and Ms. Danowski

decided to implement a Work Improvement Plan, or "action plan," for Ms. McAchren.  (Potter

Dep., at 20, Danowski Dep., at 12-16.)

The action plan was set forth in an Associate Communication Form to Joyce McAchren and

presented to her by Ms. Danowski and Ms. Potter on August 25, 2000.  (Ex. 11 to McAchren Dep.

attached as Def. Ex. A.)

The action plan set forth a brief overview of the training Ms. McAchren has received:

> Joyce has had training through our RHMS [Regional Health Management Services] as well
> as monthly updates over the past 3 years.  In the past Emmie Keller has given her extra
> training on use of the IDX system.  Cassie Endress, an office manager from Titusville was
> brought into help with education and organizational skills.  Joyce has also had the
> opportunity to attend hospital inservices such as Chip Bell and Fred Pryor which focused on
> the area of Service Excellence.

(Id.)  Next followed a list of nine assigned duties of Ms. McAchren's position:

17

    1. Greet the patient with a positive attitude and smile, a mirror will be placed at your desk to help.
    2. Check all registration information and make a copy of the current card is in the chart.
    3.  Any changes will be written on the information sheet, and on the top of the encounter form with the co-pay amount.
    4. Make changes in IDX as soon as possible.  AM by noon and PM before the end of the day.
    5. Monitor the waiting room at all times for patients that have not check[ed] in, neatness, Pt having trouble entering or leaving the building, and patients waiting for rides.
    6. Keep patient informed of any changes in the schedule or delays.
    7. Monitoring the charts: if they are in the [  ] for more than 2-3 [  ] investigate.
    8. Arrive and no show all appointment, AM to be done by lunch and PM before going home.
    9. Share in answering the " phones, taking messages, bump list and no show letters.

(Id.)  With regard to these duties, Ms. Danowski testified that "at some point, [Ms. McAchren] had problems with all of these areas."  (Danowski Dep., at 26.)  Finally, the "Action Plan" was set forth:

    1. Joyce will attend upcoming service excellence education
    2. Duties as assigned will be monitored daily by C[linical] C[oordinator, Ms. Danowski]
    3. [Ms. Potter] will meet Joyce weekly to go over performance, customer concerns and general concerns.

(Id.)  Ms. McAchren wrote in the words "I disagree" in the space designated for her signature on the action plan.  (Id.)

### e.  Decision to Terminate

Because of the last three patient complaints and because they occurred while Ms. McAchren was on the action plan, Ms. Potter recommended to Ms. Atkinson, the Director of Associate Relations, that Ms. McAchren be terminated.   (Potter Dep., at 20-21.)  Ms. Potter and Ms. Atkinson met with Ms. McAchren on September 15, 2000.  (McAchren Dep., at 48-49.)  At that time, Ms. McAchren was told that she was being suspended pending an investigation into the patient complaints and in general because of her past history of poor performance.  (September 15, 2000 Associate Warning Notice, attached a Ex. 20 to McAchren Dep. Def. Ex. A.)  On September 21,

2000, Ms. Atkinson told Ms. McAchren that the investigation was complete and the termination recommendation was being upheld. (McAchren Dep., at 49.)

To summarize, Defendant claims that Ms. McAchren was terminated because her lengthy history of poor performance, her rude and unprofessional conduct towards patients, and her failure to acknowledge or address these deficiencies despite Defendant's attempts to help her. As a result, Defendant argues that Ms. McAchren cannot establish a prima facie case of age discrimination because she cannot establish that she was qualified for her job. Defendant asserts that in order to be qualified for Ms. McAchren's clerk position, she must be able to treat patients with courtesy and respect. Defendant argues that the record evidence shows that Ms. McAchren was in fact rude and unprofessional toward patients on the phone and in person. Moreover, even though Defendant warned Ms. McAchren about her behavior and counseled her over several years, her performance never improved and in fact she consistently denied that she had problem. Therefore, Defendant concludes, she is not qualified for the position. Defendant has met its initial burden of production to show that Ms. McAchren cannot state a prima facie case, thus the burden shifts to Ms. McAchren who must set forth specific facts to show that there is a genuine issue for trial.

### 2. Ms. McAchren's Response

Ms. McAchren responds to Defendant's motion by claiming that she performed competently throughout her employment; that Defendant is lying about the facts of the three patient complaints that were in fact not complaints about her; that Defendant was considering terminating Ms. McAchren before she went on her leave of absence; and that Defendant is misleading or lying about nearly every other item of evidence cited to support its claim that Ms. McAchren was fired because of her poor work performance.

19

Ms. McAchren has offered very little direct record evidence in support of her argument, and the bulk of the argument rests on assertions that do not raise a genuine issue of material fact. In this regard, Defendant has moved to have twenty-five of its statements of undisputed material fact deemed admitted arguing that Ms. McAchren has failed to comply with Local Rule 56.1(C)(1). (Defendant's Motion to Have Certain of Defendant's Statements of Undisputed Material Facts Deemed Admitted, Doc. 26.) Specifically, Defendant asserts that Ms. McAchren failed to provide an "appropriate reference to the record" in denying, or denying as stated, twenty-five of the 105 facts asserted by Defendant. L.R. 56.1(C)(1). (Id.)

We note that the call and response of the statements of fact required by our Local Rule 56.1(B)(1) is a ripe framework for parties to argue their positions, rather than presenting a concise statement of essential facts. For example:

> [**Defendant contends**:] 10. In her capacity as Clinical Coordinator for East Harbor, Katrine Danowski became familiar with Plaintiff and her employment with SVHC. (Danowski 6).

> [**Plaintiff responds**:] 10. Denied as stated. Because of the time frames involved, Danowski was not familiar with all aspects of Plaintiff's employment and her abilities in the various position to which Plaintiff was assigned prior to her termination. More specifically, Danowski would not have been familiar with Plaintiff's employment evaluations.

Defendant moves to have its fact number 10 deemed admitted, and indeed Plaintiff does admit this fact. In doing so, however, she is unable to restrain from arguing to the Court the obvious fact that Ms. Danowski is only familiar with Ms. McAchren's employment insofar as she actually was familiar with it, or in Defendant's words "[i]n her capacity as Clinical Coordinator for East Harbor," which Plaintiff admitted began in April, 2000. Such argument adds nothing to the parties statements of fact.

Other statements of fact and response are similarly lacking in any substantial meaning for purposes of the summary judgment motion.  For example, Defendant's contentions numbered 27 through 30 concern the 1997 Associate Communication Form that is critical of Ms. McAchren.  However, Defendant neglects to mention that the Form was addressed to Ms. McAchren <u>and</u> another employee named "Ann".   Plaintiff's responses to 27 through 30 point out that the Form was addressed to both employees, but Plaintiff failed to cite to the document.  The Court was able to review the document and see for itself that the form was addressed to two employees.  The end result is that Defendant is correct that its assertions in 27 through 30 are undisputed, and at the same time Plaintiff is correct that Defendant's assertions were incomplete.

Other assertions of fact are more substantial.  For example, Defendant asserts in paragraphs 32 and 33 that Drs. Lane and Eby's opinion was that Ms. McAchren's job performance was poor.  Defendant  supports these assertions with citations to each doctor's respective affidavit.  Plaintiff inexplicably denies the asserted fact by stating that neither of the doctors' opinions shows up in one of the four formal evaluations.  Plaintiff attempts to disguise the fact that she has no evidence to contradict Drs. Lane and Eby's opinion by instead presenting an argument more properly reserved for its brief in opposition.

We decline to add an extra layer of analysis to our resolution of the motion for summary judgment by conducting a separate point-by-point analysis comparing Defendant's statements with Ms. McAchren's responses and determining whether the fact should be deemed admitted.  To the extent that any fact is necessary to a resolution of the summary judgment motion we will by necessity determine whether such fact is a genuine issue of material fact, or not.  To that extent

Defendant's motion to have certain statements of fact deemed admitted will be addressed insofar as each contention is necessary to our analysis herein.

We now turn to Ms. McAchren's argument in opposition to Defendant's motion. We need only address the arguments raised by Plaintiff that include some reliance on record evidence.

Ms. McAchren first isolates her four performance evaluations in the record dating from 1996 through 1999. Ms. McAchren argues that the 1996 and 1997 evaluations reveal such a poor performance by Ms. McAchren that a factfinder could reasonably question why Defendant would keep such a poor performer employed as long as it did. She implicitly argues that since the 1998 and 1999 evaluations show that she met competency in all areas a genuine issue of material fact exists over whether Ms. McAchren actually was qualified to do the job, and that the 1996 and 1997 evaluations are perhaps false or exaggerated.

While this is a legitimate argument, it lacks record evidence to support it when Defendant's argument is viewed in its entirety. To show that Ms. McAchren is not qualified for her position Defendant not only relied on the 1996 and 1997 evaluations, but also relied on the complaints of two doctors who worked with Ms. McAchren throughout her tenure, the patient complaints relayed to the practice by Highmark in 2000, the direct patient complaints in 2000, Ms. McAchren's supervisors' own observations of her, and Ms. McAchren's longstanding refusal to acknowledge that she had any problems. Ms. McAchren places far too much emphasis on Defendant's reliance on the 1996 and 1997 evaluations to show that Ms. McAchren is not qualified.

A factfinder must view all the evidence in determining the question of whether Ms. McAchren was qualified for her position. At best, by pointing to the April 23, 1998 evaluation and the October 5, 1999 evaluation, Ms. McAchren has raised an issue of fact over whether she was

22

qualified for her job for the first four months of 1998 and the first nine months of 1999.   Assuming

that this fact is disputed, it is not "material" if viewing the fact in favor of Ms. McAchren's it is not

likely to affect the outcome of the case under the applicable law.   Anderson, 477 U.S. at 248, 106

S.Ct. at 2510.  Such is the case here.

The 1998 and 1999 evaluations say nothing about Ms. McAchren's performance in 2000, the

year she was terminated.   There is no documentary evidence from either of the two supervisors who

completed the 1998 and 1999 evaluations to show that their evaluation of Ms. McAchren remained

true in subsequent years.   In contrast, Defendants have put forth facts supported by record evidence

to show that Ms. McAchren's performance in 2000 was poor, and consistent with her performance

evaluations from 1996 and 1997.  We conclude that the fact that she her evaluations showed her as

competent in 1998 and 1999 does not establish or raise an issue of fact as to whether she was

competent, or qualified for her job, in 2000.  Billet v. CIGNA Corp., 940 F.2d 812, 826-827 (3d Cir.

1991) (overruled in part on other grounds St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)).

In addition, in light of all the record evidence we conclude that a factfinder could not reasonably

believe that Ms. McAchren was qualified for her position based solely on the 1998 and 1999

evaluations.

Similarly, Plaintiff claims that a genuine issue of material fact exists with regard to whether

she was qualified because Defendant assigned her to answer telephone calls when it split the Clerk

position duties.   However, it is clear from the record evidence that at the time of the reassignment

Ms. Potter felt that Ms. McAchren could not handle performing both functions:

> **Q.**  Okay, was that separation done because of a problem with her performance or because
> the practice had grown to the point where there were more phone lines and somebody was
> needed to be dedicated to the lines?
> **A.**  I would say it was her performance, because when I had people in other positions, they

handled it fairly well.

(Potter Dep., at 8.)  Ms. Potter then moved Ms. McAchren to work in the file room "when the phone

complaints became so large."  (Potter Dep., at 9.)

Plaintiff suggests that by placing her to answer phones a factfinder could infer that

Defendant found her performance to be acceptable.  However Ms. McAchren offers no evidence to

rebut Defendant's evidence that the reason she was placed on the phones was because she could not

handle performing the full duties of her position.  Even if we assume that Plaintiff is correct, that

Defendant viewed her as qualified to perform her job at the time the Clerk position duties were split,

the material issue of fact is whether Ms. McAchren was qualified for her position when Defendant

terminated her.  In this regard, we do not view the documentary evidence in isolation and after "the

phone complaints became so large", Defendant in fact removed Ms. McAchren from answering the

phone to the file room.  (Potter Dep., at 9.)

Ms. McAchren also suggests that Defendant must have thought she was qualified when it

assigned her to the registration desk after her medical leave where she had to answer phones and

talk to patients.  This argument, however, ignores the fact Defendant was bound to honor Ms.

McAchren's doctor's note prohibiting her from working in the file room due to her back injury.  We

find no genuine issue of material fact on this issue.

Next, Plaintiff argues that Defendant is not being truthful about when it first learned that two

Highmark customers had complained about Ms. McAchren by name.  Ms. Potter testified that she

first learned of the complaints at a regularly scheduled quarterly meeting.  (Potter Dep., at 19.)  In

response, Plaintiff points to the handwritten note dated May 10, 2000, appearing on one of the

complaint documents produced by Highmark referring to a patient complaint about getting a

24

referral.  (Ex. 2 to Def. Ex. I., 5-8.)  The note states:

> 5/10/00 Nancy Potter - discussed with her:
> They have a note saying 72 hrs. for a referral.  (This was probably an urgent situation
>                    & injury happened on a weekend.

(Id. at 6.)  Plaintiff argues that Ms. Potter thus learned that this patient had complained about Ms.

McAchren before she began her medical leave.  Plaintiff does not provide any documentary

evidence to contradict Ms. Potter's testimony that she learned from Highmark that two patients had

specifically named Ms. McAchren when complaining about the service they received while Ms.

McAchren was on medical leave.  The above handwritten note refers to an attempt to assist the

customer in getting a referral in a time-sensitive emergency situation, not to inform Ms. Potter of a

patient complaint about a specific employee.  In contrast, Ms. Potter explained the process as

follows:

> **A.** . . . in the case of the Highmark people, which is one of our biggest insurance carriers, I
> would have to sit with a representative and review the patient complaints, and like I said,
> then when they're named, then you need to go back and talk to the associate and say that,
> you know, the carrier says that you were rude to this patient.  We're never told the patient's
> name by the carrier.
> **Q.**  Okay, when Highmark or Keystone bring you this information, do they give you a
> written report.
> **A.**  No.
> **Q.**  Do you take notes when they talk to you?
> **A.**  They ask us not to.

(Potter Dep., at 12.)  More specifically, Ms. Potter testified that "while Joyce was away, I got my

quarterly review from Highmark, which I sit down with their representative, and she was named as

being rude and not friendly."  (Potter Dep., at 19.)  Ms. Potter also explained that at these meetings

Highmark is protective of its customer's confidentiality and she is never told who the patient is:

> **Q.**  Okay, how much specific information do they give you when they tell you that
> somebody was named as rude or not friendly or that there was a problem with somebody on
> your staff?
> **A.**  Just that.

**Q.** That there's a problem?
**A.** That this person, when I talked to them on the phone, was extremely rude or unhelpful.
**Q.** Okay, so there's no way for you to verify that information?
**A.** No.
**Q.** There's no way for you to do any further investigation?
**A.** (witness shakes head from side to side.) Because I don't have the patient's name.

(Id.; see also id., at 75, 78.)  Plaintiff has not offered any deposition testimony from Ms. Potter regarding the note, nor did Plaintiff offer any other evidence from a representative of Highmark that might elaborate on the note.  In contrast, Defendant's evidence shows that Highmark handled customer complaints about specific employees in a manner designed to protect the identity of the customer.  Plaintiff's evidence only shows that Highmark attempted to resolve an emergency situation for its customer.  We conclude that there is no genuine issue of material fact as to when Defendant learned from Highmark that its customers had specifically complained about how they were treated by Ms. McAchren.

Next, Plaintiff challenges all three of the patient complaints occurring after Defendant placed Ms. McAchren on the action plan.  As to Ms. Gorka's complaint, Ms. McAchren claims that she was not present because she was in a meeting with her supervisors to discuss the action plan.  Ms. McAchren is unable to support this claim with documentary evidence.  Defendant supports its version of the incident through the following:

- testimonial evidence from Ms. Danowski that Ms. Gorka identified Plaintiff by name and pointed to her;

- testimonial evidence from Ms. Danowski that two other employees confirmed that it was Ms. McAchren who dealt with Ms. Gorka; and

- Ms. Gorka's affidavit stating that she was complaining about Ms. McAchren.

Ms. McAchren offers no contradictory evidence other than her own testimony that she was not

26

present.  We thus conclude  that no reasonable factfinder could find that Ms. McAchren was not involved in this incident.

Next, Ms. McAchren attempts to challenge Mr. Hughes complaint against her by citing the written warning.  She did not sign the form and claims it was never presented to her.  Accepting as true that the written warning was never presented to her, Ms. McAchren still fails to offer any evidence to challenge the fact that Mr. Hughes actually did complain about her and that Defendant did rely on this complaint in its decision to terminate her.  There is no genuine issue of material fact regarding the occurrence of Mr. Hughes' complaint.

Finally, Ms. McAchren offers Ms. Markle's testimony from Ms. McAchren's worker's compensation hearing.  Ms. Markle testified that she did complain about an employee of Defendant to Ms. Danowski, but it was not Ms. McAchren.  (Markle testimony, at 41, Pl. Ex. M.)  In response, Defendant points out that it offered contemporary evidence in the form of Ms. Danowski's September 6, 2000 Associate Communication Form, which shows that Ms. Markle initially identified Ms. McAchren as the employee who had been rude to her.  Defendant also notes that Ms. Markle's later testimony occurred 15 months after the incident, thus it is possible that her later testimony is incorrect.  We conclude that there is a disputed issue of fact as to whether Ms. Markle identified Ms. McAchren as the employee who was rude to her.

Defendant though still argues that it had an honest belief at the time of the telephone call that it was Ms. McAchren who had been rude to Ms. Markle and appropriately disciplined her.  Thus, Defendant argues that Plaintiff cannot show that Defendant's reliance on Ms. Markle's complaint is evidence of pretext.  We agree.

27

We also conclude that although this fact is disputed, it is not material.  In accepting

Plaintiff's version of this incident we still reach the same outcome under the law, that is, that the

record evidence shows that Ms. McAchren was not qualified for her position.  While a factfinder

faced with the contradictory testimony of Ms. Markle and Ms. Danowski might reasonably believe

that Ms. Markle did not identify Ms. McAchren as the employee who had been rude to her on the

telephone; based on the record evidence as a whole a factfinder could not reasonably conclude that

Ms. McAchren was qualified for her position.

Next, Plaintiff contends that Defendant is lying about when it decided to terminate Ms.

McAchren.  Defendant asserts that it was after the three patient complaints were received in August

and September 2000 that it decided to recommend termination.  Plaintiff argues that the termination

process was underway before she returned from medical leave.  (Plaintiff's Memorandum, at 8.)

Plaintiff supports this argument by citing to Ms. Atkinson's testimony given at the workers'

compensation hearing and referring to a document produced during discovery.  (Atkinson

Testimony, at 45; SCHC00374.)

Plaintiff did not provide the Court with Ms. Atkinson's testimony.  Defendant did attach the

relevant portions of Ms. Atkinson's testimony.  (Atkinson Testimony, at 44-46, Def. Ex. B attached

to Defendant's Reply Brief.)   Our review of the evidence shows that Plaintiff mischaracterizes the

substance of Ms. Atkinson's testimony.  Ms. Atkinson's testimony refers to the ongoing process of

addressing Ms. McAchren's performance and attempting to assist her and discipline her.  Ms.

Atkinson's testimony does not support Plaintiff's argument that Defendant had made the decision to

terminate her before she returned from medical leave.  Plaintiff's other evidence and arguments

regarding this issue similarly fail to distinguish the decision to terminate from an ongoing

28

disciplinary process.    We find that there is no issue of disputed fact about when the decision to terminate was made.

Plaintiff also generally complains that Defendant does not have the proper documentation of complaints from patients, doctors, or office staff.   Ms. McAchren offers no record evidence to raise an issue of disputed fact.  In contrast, Defendant provides record evidence of testimony, affidavits, and documentation to support its position that patients, doctors, and staff have complained about Ms. McAchren's performance.  Defendant has also provided testimonial evidence from Ms. McAchren's supervisors as to their observations of her poor performance.  Defendant has met its burden of producing evidence in support of its motion.  Plaintiff, however, has failed to produce evidence to demonstrate the existence of a material factual dispute.

The record evidence demonstrates that there is no genuine issue of material fact that Ms. McAchren was not qualified for her position when Defendant terminated her.  Thus, we find that she cannot establish a prima facie case of age discrimination, and her claim will be dismissed.

### B.  Retaliation

"To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action."  Weston v. Pennsylvania Department of Corrections, 251 F.3d 420, 430 (3d Cir. 2001) (citations omitted).

Defendant first notes that Ms. McAchren conceded that she had never filed a workers' compensation claim thereby conceding that she cannot establish the first prong of a prima facie case of retaliation.  (See McAchren Dep., at 31.)  In response, Ms. McAchren claims that once she filed

an injury report with Defendant's Employee Health Service a workers' compensation claim was automatically filed by Defendant. Therefore, she argues that it is reasonable to "surmise that Plaintiff's Supervisor" was aware of the claim. (Plaintiff's Memorandum, at 3.)

Ms. McAchren does not support her argument with any record evidence to show that any of the relevant supervisors involved in this case were actually aware that a workers' compensation claim was filed on her behalf. In contrast, Defendant has offered record evidence from Ms. Potter and Ms. Atkinson to show that they each were unaware that Ms. McAchren had filed an injury report, or that a workers' compensation claim was filed on her behalf automatically, until after Ms. McAchren was terminated. (Potter Dep., at 35-36; Atkinson Dep., at 32-33.) Thus, even if it was determined that Ms. McAchren engaged in protected activity she is unable to show a causal link between the automatic filing of a claim and her termination. Plaintiff thus cannot establish a prima facie case of retaliatory discrimination, and her claim will be dismissed.

### C. Pretext

Defendant also argues that even if Ms. McAchren can set forth a prima facie case, she cannot show that she was terminated based on her age or in retaliation for engaging in protected activity. Defendant has presented evidence of a legitimate non-discriminatory reason for her termination, *i.e.*, Ms. McAchren's poor work performance and related discipline coupled with her failure to acknowledge or address her deficiencies. Thus, Ms. McAchren must demonstrate that the proffered reason was merely a pretext for unlawful discrimination.

A "plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action.'" Jones v. School District of Phila., 198 F.3d 403, 413 (3d Cir. 1999) (quoting

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) and Sheridan v. E.I. DuPont de Nemours and

Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (*en banc*), cert. denied, 521 U.S. 1129 (1997)).

     As stated previously, Ms. McAchren's argument is primarily a blanket denial that she had

any performance deficiencies at all.    Ms. McAchren's denial was set forth in her deposition:

> **Q.**  . . .  Do you understand that the criticism of your interaction with patients goes - -  ...
>     . . .
> **Q.**  . . . goes all the way back to '96 or '94 or whatever the first document was.
> **A.** No, these are not true.
> **Q.** Well, your position is that none of this is true; isn't that correct?
> **A.** That's right.  You're absolutely right.
> **Q.** And that this criticism of you is constant from 1994 or '96, whatever the date of the first
> document is, all the way through September of 2000, isn't it?
> **A.** That's what it says.
> **Q.** And you've never accepted that criticism, any of that criticism, as being accurate?
> **A.** That's correct.
> **Q.** That's correct.  You've never accepted any of the criticism of your performance not only
> your interactions with the patients but also how you did coding or anything else as being
> correct; isn't that true?
> **A.** That's correct.

(McAchren Dep., at 56-57.)  While denying that she had any performance deficiencies, Ms.

McAchren also admitted that she had no evidence to show that her supervisors were lying about the

reasons for her terminations:

> **Q.** You don't have any facts that would show that [the management of the hospital would]
> be lying  if they said that they recommended your termination because, in the two weeks or
> three weeks, the 19 days between your return frm surgery and the date of your last day of
> work, they received at least two complaints about you from patients?
> **A.** Well, they received the three.  That one, I know is not true, and I don't have any facts
> other than knowing myself that I didn't see the one on Hughes because I never signed it one
> way or the other.  I have no complaint - - no problem signing these.  I would have signed it,
> you know, that I didn't agree with it, but no, I don't have any facts, any proof.

(McAchren Dep., at 55.)

She also was unable to cite to any evidence to show that three younger individuals hired while she was on leave would not have been hired even if she was not on leave:

> **Q.** . . . . You've never accepted any of the criticism of your performance not only your interactions with the patients but also how you did coding or anything else as being correct; isn't that true?
> **A.** That's correct.
> **Q.** But yet you have no fact that shows that any of these decisions was based upon your age; isn't that also correct?
> **A.** The only thing I have to say about that is, when I was off, the seven weeks that I was off, three girls under - - well, probably between the age of 20 and 30 were hired while I was off on my sick leave.
> **Q.** You don't know that they wouldn't have been hired if you were still there, do you?
> **A.** I don't know.

(McAchren Dep., at 56-57.)  In contrast, Defendant has explained that one of the three younger individuals, Jodie Kwitoski, was hired from an externship program as a part-time employee replacing another part-time employee who had quit.  (Potter Dep., at 29-30.)  After a full-time employee quit, Ms. Kwitoski was moved into the full-time position.  (Potter Dep., at 30.)  The second of the three younger individuals, Mindy Olson, was hired from the externship program to take Ms. Kwitoski's spot.  (Potter Dep., at 30-31.)  Finally, the third individual, Amy Hodas, was hired for a position at East Harbor Medical practice but not as a replacement for Ms. McAchren. (Potter Dep., at 31.) Ms. McAchren has failed to set forth any evidence to demonstrate that these individuals would not have been hired even if she was not on medical leave.

Likewise, Defendant has offered evidence that younger employees were counseled and placed on action plans just as Ms. McAchren was.  (Potter Dep., at 21-24.)  Two of the individuals voluntarily left the practice and the third showed improvement.  (Potter Dep., at 22-24.)  Ms. McAchren has offered no evidence to contradict Defendant's evidence.  Moreover, no other

32

employee of Defendant had as many complaints as did Ms. McAchren or showed an inability or unwillingness to improve.

Defendant also offered evidence to show that of twenty-one employees terminated by Defendant for disciplinary or performance reasons in 2000, all of them were younger than Ms. McAchren. (Affidavit of Johnie Atkinson, at ¶ 3, attached as Def. Ex. J.) Fourteen of the twenty-one firings were under 40 years of age. (Id.) None of the twenty-one employees who were fired had filed a workers' compensation claim or reported a job-related injury in the year prior to their termination. (Id. at ¶ 4.) Ms. McAchren has presented no record evidence challenging these facts.

As discussed above, the record evidence from diverse sources over several years shows that Ms. McAchren had longstanding performance problems. Ms. McAchren's strongest piece of documentary record evidence in support of a pretext argument is Ms. Markle's testimony in December, 2001, that she did not identify Ms. McAchren as the cause of a discourteous rude telephone call. From that evidence Ms. McAchren must argue that Ms. Danowski is lying when she testified that Ms. Markle told her that the person who answered her call was Ms. McAchren, and when she wrote that information on the Associate Communication Form the day she took Ms. Markle's telephone call. However, Ms. McAchren has no record evidence to support such an assertion. Moreover, her assertion fails to acknowledge the legitimate nondiscriminatory reasons Defendant had for terminating her. Despite her assertions to the contrary the record evidence overwhelmingly shows that she performed poorly for several years garnering complaints from patients, co-workers, supervisors, and doctors, and that she failed to acknowledge that she had any performance problems. Defendant claims that it terminated Ms. McAchren based solely on her poor performance, her continued rudeness and unprofessional behavior towards patients, her

unwillingness to admit to her deficiencies, and the absence of improvement in her performance despite Defendant's efforts.

In addition, in light of the overwhelming other evidence in support of Defendant's articulated reason for terminating Ms. McAchren we cannot conclude that based on Ms. Markle's testimony a factfinder could reasonably disbelieve that Defendant fired Ms. McAchren because of her ongoing poor performance and refusal to address her deficiencies. Likewise, we cannot conclude that a factfinder could reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's decision. Simply put, in light of all the evidence no reasonable factfinder could believe Ms. McAchren's claims that she had no performance deficiencies and that the management of East Harbor Medical Practice is lying about the reasons for her termination as a pretext to unlawfully discriminate against her.

Ms. McAchren has failed to show that Defendant's reasons were a pretext for an unlawful termination. We find that even if Plaintiff could set forth a prima facie case she cannot rebut Dependant's legitimate non-discriminatory reason for her termination. Thus, summary judgment in favor of Defendant is warranted because there is no genuine issue of material fact that Defendant's actions were not a pretext for unlawful age discrimination or to retaliate for filing a workers' compensation claim.

## IV.  Conclusion

Our review of the record evidence shows that there is no genuine issue of material fact as to whether Ms. McAchren is qualified for her position for purposes of establishing a prima facie case of age discrimination. We also find that Ms. McAchren cannot establish a causal link between the automatic filing of a workers' compensation claim and her termination because there is no genuine

issue of material fact that none of the decision-making supervisors were aware that Ms. McAchren

had engaged in protected activity.  In addition, even if Ms. McAchren were able to set forth a prima

facie case, we conclude that the record evidence establishes that there is no genuine issue of material

fact that Defendant terminated Ms. McAchren based on legitimate non-discriminatory reasons.  We

thus conclude that summary judgment is appropriate with regard to Ms. McAchren's age

discrimination and retaliation claims.

 An appropriate Order will be entered.


November 3, 2005
_____
Date

Maurice B. Cohill, Jr.
_____
Maurice B. Cohill, Jr.,
Senior District Judge


cc: counsel of record

35

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOYCE McACHREN,          )
                             )
     Plaintiff,         )
                             )
        v.           )     Civil No.  02-285 Erie
                             )
SAINT VINCENT HEALTH CENTER,  )
                             )
     Defendant.      )

## ORDER

AND NOW, to-wit, this _____3ʳᵈ_____ day of November, 2005, after careful consideration and

for the reasons set forth in the Opinion accompanying this Order, it is hereby ORDERED,

ADJUDGED, and DECREED as follows:

    **1.** Defendant's Motion for Summary Judgment (**Doc. 17**) be and hereby is GRANTED as
follows:

        **a.** Summary Judgment is GRANTED as a matter of law in favor of Defendant and
against Plaintiff on Plaintiff's age discrimination claims brought pursuant to the Age
Discrimination in Employment Act (29 U.S.C. § 621 *et seq*.), and the Pennsylvania
Human Relations Act (43 P.S. 951, *et seq.),* said claims are hereby dismissed.

        **b.** Summary Judgment is GRANTED as a matter of law in favor of Defendant and
against Plaintiff on Plaintiff's claim of wrongful discharge alleging that Defendant
terminated her in retaliation for filing a workers' compensation claim in violation of
Pennsylvania public policy, said claim is hereby dismissed.

36

**2.** Defendant's Motion to Have Certain of Defendant's Statements of Undisputed Material Facts Deemed Admitted (**Doc. 26**), be and hereby is Granted insofar as it is consistent with the Opinion accompanying this Order, and Denied in all other respects.

**3.** The Complaint is dismissed and this case is closed.


*Maurice B. Cohill, Jr.*

Maurice B. Cohill, Jr.
Senior United States District Judge


cc:    counsel of record


37